Slip Op. 06-89

# UNITED STATES COURT OF INTERNATIONAL TRADE

<table>
<tr>
<td>

**ALLIED PACIFIC FOOD (DALIAN) CO. LTD., ALLIED PACIFIC (H.K.) CO. LTD., KING ROYAL INVESTMENTS, LTD., ALLIED PACIFIC AQUATIC PRODUCTS (ZHANJIANG) CO. LTD., ALLIED PACIFIC AQUATIC PRODUCTS (ZHONGSHAN) CO. LTD.,** and **YELIN ENTERPRISE CO., HONG KONG**,

Plaintiffs,

v.

**UNITED STATES**,

Defendant.

</td>
<td>

Before:  Timothy C. Stanceu, Judge

Consol. Court No. 05-00056

</td>
</tr>
</table>

## OPINION AND ORDER

[Final antidumping less-than-fair-value determination remanded for further proceedings where defendant seeks voluntary remand on surrogate value for labor rate and where surrogate value of raw material is unsupported by substantial evidence on the record]

Dated: June 12, 2006

*Grunfeld, Desiderio, Lebowitz, Silverman & Klestadt LLP* (*Bruce M. Mitchell*, *Mark E. Pardo*, *Ned H. Marshak* and *William F. Marshall*) for plaintiffs Allied Pacific Food (Dalian) Co. Ltd., *et al.*

*Akin, Gump, Strauss, Hauer & Feld LLP* (*Spencer S. Griffith* and *Lisa W. Ross*) for plaintiff Yelin Enterprise Co., Hong Kong.

*Peter D. Keisler*, Assistant Attorney General, *David M. Cohen*, Director, Commercial Litigation Branch, *Patricia M. McCarthy*, Assistant Director, Commercial Litigation Branch, United States Department of Justice; *Christine J. Sohar*, Office of the Chief Counsel for Import Administration, United States Department of Commerce, of counsel, for defendant.

Stanceu, Judge:  Plaintiffs Allied Pacific Food (Dalian) Co. Ltd., Allied Pacific (H.K.)

Co. Ltd., King Royal Investments, Ltd., Allied Pacific Aquatic Products (Zhanjiang) Co. Ltd.,

Allied Pacific Aquatic Products (Zhongshan) Co. Ltd. (collectively "Allied Pacific") and Yelin

Enterprise Co. Hong Kong ("Yelin") challenge two aspects of a final less-than-fair-value

determination issued by the U.S. Department of Commerce ("Commerce" or the "Department")

in an antidumping duty investigation conducted in 2004.  The imported merchandise that was the

subject of the antidumping investigation ("subject merchandise") was certain frozen and canned

warmwater shrimp from the People's Republic of China ("China" or the "PRC").  Plaintiffs

contend that the final determination and the amended final determination and order should not be

upheld by the court because the Department's determinations of surrogate values for labor and

for raw shrimp used in producing the subject merchandise were unsupported by substantial

evidence on the record and were otherwise contrary to law.

Plaintiffs argue that in calculating the surrogate labor value, Commerce violated the

statutory requirement to use data from countries that are economically comparable to China and

are significant producers of the subject merchandise.  They contend that the Department's use of

labor wage rates from developed countries resulted in a surrogate labor wage rate that is more

than 600 percent higher than the actual labor wage rate of Commerce's chosen surrogate

country, India.  Plaintiffs also argue that Commerce, in calculating the surrogate labor rate,

should have used current, publicly available information as required by the Commerce

regulations.  Defendant requests a voluntary remand, acknowledging that Commerce may have

erred in calculating the surrogate labor wage rate.  The court remands this issue to Commerce for

a redetermination of the labor rate, as requested by defendant, subject to the requirements of the

Order accompanying this Opinion.

Accordingly, the court proceeds to consider plaintiffs' challenge to the Department's choice of a surrogate value for raw shrimp. Plaintiffs seek a remand directing Commerce to redetermine this surrogate value using information plaintiffs placed on the record in the investigation, which is count-size-specific data on shrimp prices collected by the Seafood Exporter's Association of India ("SEAI"). Plaintiffs contend that Commerce erred by instead basing the surrogate value for raw shrimp on data obtained from the financial statement of an Indian seafood producer, Nekkanti Sea Foods Ltd. ("Nekkanti"), which the petitioner in the antidumping investigation had submitted for the record.

Because China is considered to be a nonmarket economy country, the antidumping statute in this instance required Commerce to calculate the value of the factors of production utilized in producing the subject merchandise, including, specifically, the quantities of raw materials employed, using the best available information in one or more market economy countries that are at a level of economic development comparable to China and that are significant producers of comparable merchandise. The principal raw material used in producing the subject merchandise was raw, head-on, shell-on shrimp, *i.e.*, "unprocessed" shrimp. Defendant does not dispute that the Nekkanti financial statement data appear to be based in part on materials other than unprocessed shrimp, including seafood other than shrimp and shrimp that has been partially processed. Defendant instead argues, *inter alia*, that Commerce acted within its statutory discretion in relying on those data. Commerce, however, was required to support with substantial evidence on the record its determination that the Nekkanti financial statement data were the best available information for valuing unprocessed shrimp. Yet Commerce made no findings as to the quantity of raw material consisting of seafood other than shrimp, or of

partially processed shrimp, that was reflected in the Nekkanti data. Nor did Commerce adjust the surrogate value to account for these variances or explain how its methodology could have satisfied the statutory requirement to use the best available information.

Commerce also failed to explain how it came to conclude that other data sets were inferior to the Nekkanti financial statement data according to several criteria that the Department itself identified as indicative of "best available information." Commerce, in the underlying investigation, stated that it prefers to rely on surrogate data that represent a broad market average, are contemporaneous with the period of investigation, are specific to the input in question, and are publicly available. Commerce invoked these criteria to discredit the data sets other than the Nekkanti financial statement data and appears to have chosen the Nekkanti data because the financial statement was audited and publicly available. Commerce failed to explain why it did so even though the Nekkanti financial statement data did not better satisfy any of the other criteria. For these reasons, as discussed in further detail in this Opinion, the court finds that the Department's selection of the Nekkanti financial statement data as the "best available information," and its resulting calculation of the surrogate value for raw shrimp, were unsupported by substantial evidence on the record and, accordingly, were contrary to law.

The court, exercising its jurisdiction under 28 U.S.C. § 1581(c) (2000), remands the final determination to Commerce for redetermination in accordance with this Opinion.

## I. BACKGROUND

Plaintiffs Allied Pacific and Yelin challenge the surrogate values Commerce calculated for labor and raw shrimp in the final, and amended final, less-than-fair-value determinations that Commerce issued in its antidumping duty investigation of imports of certain frozen and canned

warmwater shrimp from China. *See Notice of Final Determination of Sales at Less Than Fair Value for Certain Frozen and Canned Warmwater Shrimp From the People's Republic of China*, 69 Fed. Reg. 70,997 (Dec. 8, 2004) ("*Final Determination*"). In its amended final less-than-fair-value determination, Commerce calculated weighted average dumping margins of 80.19 percent for Allied Pacific and 82.27 percent for Yelin. *Notice of Amended Final Determination of Sales at Less Than Fair Value and Antidumping Duty Order for Certain Frozen Warmwater Shrimp From the People's Republic of China*, 70 Fed. Reg. 5149, 5151 (Feb. 1, 2005) ("*Amended Final Determination and Order*"). Plaintiffs assert that Commerce, in calculating these margins, failed to use the best available information when selecting data to calculate the raw shrimp surrogate value, erred in calculating the "standard" size raw shrimp surrogate value, and erred further in extrapolating count-size-specific prices from the standard value. *Pl. Allied Pacific's Br. in Supp. of Mot. for J. on the Agency R.* at 4 ("*Allied Pacific's Br.*"); *Pl. Yelin's Mem. in Supp. of Mot. for J. on the Agency R.* at 5-6 ("*Yelin's Br.*"). On April 4, 2005, pursuant to USCIT R. 56.2, plaintiffs moved for judgment on the agency record.

A. Constructed Value of the Foreign Like Product in a Nonmarket Economy Country

In an antidumping investigation, both Commerce and the U.S. International Trade Commission ("ITC" or "Commission") must issue affirmative findings before an order assessing antidumping duties may be issued. 19 U.S.C. § 1673 (2000). In its "less-than-fair-value" determination, Commerce determines whether imported subject merchandise is being unfairly traded by being "dumped," *i.e.*, sold or likely to be sold in the United States for less than its "normal value," and also determines the degree of dumping, *i.e.*, the "dumping margin." *See* 19 U.S.C. § 1673d(a)(1) (2000); 19 U.S.C. § 1677(34)-(35) (2000); 19 U.S.C. § 1677b(a) (2000).

The ITC determines whether a domestic industry is suffering material injury or threat of material injury due to the importation and sale of the subject merchandise in the United States. *See* 19 U.S.C. § 1673d(b); 19 U.S.C. § 1677(7).

In an investigation, to determine whether and to what extent subject merchandise was "dumped," Commerce determines whether and to what extent the "normal value" (or "constructed normal value") of the "foreign like product"[1] exceeds the price at which the subject merchandise is sold in the United States (the "export price" or the "constructed export price").[2] *See* 19 U.S.C. § 1677b(a). Under the antidumping duty law, Commerce must use a separate methodology for determining the constructed normal value of the foreign like product if the subject merchandise is produced in a nonmarket economy country. A nonmarket economy country is one that does not operate according to market principles of cost or pricing structures

---

[1] The term "foreign like product" means, in descending order, "subject merchandise and other merchandise which is identical in physical characteristics with, and was produced in the same country by the same person as, that [subject] merchandise"; merchandise that is "like that [subject] merchandise in component material or materials and in the purposes for which used, . . . approximately equal in commercial value to that [subject] merchandise," and "produced in the same country and by the same person as the subject merchandise"; merchandise that is "of the same general class or kind as the subject merchandise," is "like that [subject] merchandise in the purposes for which used," "may reasonably be compared with that [subject] merchandise" as determined by Commerce, and is "produced in the same country and by the same person" as the subject merchandise. 19 U.S.C. § 1677(16) (2000).

[2] "Export price" is "the price at which the subject merchandise is first sold (or agreed to be sold) before the date of importation by the producer or exporter of the subject merchandise outside of the United States to an unaffiliated purchaser in the United States or to an unaffiliated purchaser for exportation to the United States," with certain adjustments. 19 U.S.C. § 1677a(a), (c) (2000). "Constructed export price" is, in the usual instance, "the price at which the subject merchandise is first sold (or agreed to be sold) in the United States before or after the date of importation by or for the account of the producer or exporter of such merchandise or by a seller affiliated with the producer or exporter, to a purchaser not affiliated with the producer or exporter," with certain adjustments. 19 U.S.C. § 1677a(b)-(d) (2000).

so that sales of merchandise in that country fail to reflect the fair value of such merchandise.

19 U.S.C. § 1677(18)(A). To determine whether a country has a market or a nonmarket

economy, the Department evaluates several factors: the extent of currency convertibility; the

extent to which free bargaining between labor and management determines wage rates; the

extent to which the government allows joint ventures or other foreign investment; the extent to

which the government owns or controls the means of production; the extent to which the

government controls the allocation of resources and the pricing and output decisions of

enterprises; and other appropriate factors. 19 U.S.C. § 1677(18)(B). Commerce considers China

to be a nonmarket economy country. *See Memorandum from Alex Villanueva, Senior Case*

*Analyst, & John D. A. LaRose, Case Analyst, to The File* at 1 (June 9, 2004) (Admin. R. Doc.

No. 386) ("*Selection of Surrogate Country*").

In a nonmarket economy country, the Department usually calculates the constructed

value of the foreign like product according to a factors-of-production method specified by

statute. *See* 19 U.S.C. § 1677b(c)(1). Under this method, the Department identifies and

quantifies the factors of production[3] utilized in producing the subject merchandise and then

determines values for these factors based on the best available information pertaining to a market

economy country that is at a level of economic development comparable to that of the nonmarket

economy country and that is a significant producer of either the subject merchandise or

comparable merchandise. 19 U.S.C. § 1677b(c)(1), 1677b(c)(3)-(4) (2000). The methods

---

[3] As specified by the statute, the non-exhaustive list of factors of production subject to valuation includes the hours of labor required to produce the merchandise, the quantities of raw materials used, the amount of energy and other utilities consumed in the production process, and any representative capital cost, including depreciation. 19 U.S.C. § 1677b(c)(3).

Commerce used to value two of these factors, the surrogate labor wage rate and the surrogate raw shrimp value, are at issue in this case.

B.  Procedural History of the Antidumping Duty Investigation

The Ad Hoc Shrimp Trade Action Committee ("petitioner"), which represents U.S. producers of frozen and canned warmwater shrimp and harvesters of wild-caught warmwater shrimp, petitioned Commerce on December 31, 2003, requesting an investigation of imports of certain frozen and canned warmwater shrimp from China.  *Letter from Dewey Ballantine LLP to Secretary of Commerce* at 1 (Dec. 31, 2003) (Admin. R. Doc. No. 1).  On January 27, 2004, Commerce initiated the investigation.  *Notice of Initiation of Antidumping Duty Investigations for Certain Frozen and Canned Warmwater Shrimp From Brazil, Ecuador, India, Thailand, the People's Republic of China and the Socialist Republic of Vietnam*, 69 Fed. Reg. 3876 (Jan. 27, 2004).  The period of investigation was April 1, 2003 through September 30, 2003.  *Preliminary Determination*, 69 Fed. Reg. at 42,659.

On February 17, 2004, the ITC notified Commerce of its affirmative preliminary injury determination.  *See Letter from Robert Carpenter, Director, U.S. International Trade Commission, to The Honorable James Jochum, Assistant Secretary for Import Administration, U.S. Department of Commerce* (Feb. 24. 2004) (Admin. R. Doc. No. 94).  The ITC preliminarily found a reasonable indication that a U.S. industry is materially injured by certain frozen or canned warmwater shrimp imported from Brazil, China, Ecuador, India, Thailand, and the Socialist Republic of Vietnam and allegedly sold at less than fair value in the United States.  *Certain Frozen or Canned Warmwater Shrimp and Prawns from Brazil, China, Ecuador, India,*

*Thailand, and Vietnam*, USITC Pub. 3672, Inv. Nos. 731-TA-1063-1068 (Preliminary) at 1, 3

(Feb. 2004) (Admin. R. Doc. No. 95) ("*ITC Preliminary Determination*"). The ITC defined a

single domestic like product in the preliminary determination to include fresh, frozen, and

canned warmwater shrimp that fall within the scope of the antidumping duty investigation as

defined by Commerce. *Id.* at 8, 20, 22.

Commerce subsequently identified plaintiffs Allied Pacific and Yelin as mandatory

respondents in the investigation, pursuant to 19 U.S.C. § 1677f-1(c)(2) (2000). *See*

*Memorandum from Edward C. Yang, Office Director, Office 9, to Joseph Spetrini, Deputy*

*Assistant Secretary for Import Administration, Group III* at 3 (Feb. 23, 2004) (Admin. R. Doc.

No. 89) ("*Selection of Respondents*"); *see also Issues and Decision Memorandum* at 4 n.7.

Commerce determined preliminarily that plaintiffs Allied Pacific and Yelin, among others, were

selling or were likely to sell the subject merchandise – certain frozen and canned warmwater

shrimp – in the United States at less than fair value. *Notice of Preliminary Determination of*

*Sales at Less Than Fair Value, Partial Affirmative Preliminary Determination of Critical*

*Circumstances and Postponement of Final Determination for Certain Frozen and Canned*

*Warmwater Shrimp From the People's Republic of China*, 69 Fed. Reg. 42,654, 42,664

(July 16, 2004) ("*Preliminary Determination*"). Having determined China to be a nonmarket

economy, Commerce, pursuant to 19 U.S.C. § 1677b(c)(1), determined the normal value of the

subject merchandise on the basis of factors of production utilized in producing the merchandise,

"valued in an economically comparable market economy [country] that is a significant producer

of comparable merchandise." *Preliminary Determination*, 69 Fed. Reg. at 42,660. Commerce

selected India as the surrogate market economy country. *Selection of Surrogate Country* at 7; *Final Determination*, 69 Fed. Reg. at 71,001. The Department calculated a preliminary weighted average dumping margin of 90.05 percent for Allied Pacific and 98.34 percent for Yelin. *Preliminary Determination*, 69 Fed. Reg. at 42,671.

Despite allegations by Allied Pacific and Yelin that the Department made ministerial errors in calculating the preliminary dumping margin by erroneously valuing the surrogate factors of production, Commerce declined to amend any findings regarding Allied Pacific or Yelin in the *Preliminary Determination*. *Notice of Amended Preliminary Antidumping Duty Determination of Sales at Less Than Fair Value for Certain Frozen and Canned Warmwater Shrimp From the People's Republic of China*, 69 Fed. Reg. 53,409, 53,410-11 (Sept. 1, 2004) (Admin. R. Doc. No. 700). Commerce considered the alleged ministerial errors not to be significant and explained that Allied Pacific and Yelin could raise the alleged errors in their case briefs for consideration in the final antidumping duty determination. *Id.* at 53,411.

On December 8, 2004, Commerce issued its final determination pursuant to 19 U.S.C. § 1673d, concluding that certain frozen and canned warmwater shrimp from China are being, or are likely to be, sold in the United States at less than fair value. *See Final Determination*, 69 Fed. Reg. at 70,997. The Department confirmed its choice of India as the surrogate country for valuing surrogate factors of production. *Id.* at 71,001. Commerce also amended the surrogate labor and raw shrimp values to account for some of the parties' comments regarding those surrogate values. *See id.* at 71,003; *Issues and Decision Memorandum for the Antidumping Duty Investigation of Certain Frozen and Canned Warmwater Shrimp from the People's Republic of*

*China* at 12-16, 17-18 (Nov. 29, 2004) (Admin. R. Doc. No. 814) ("*Issues and Decision Memorandum*"). In the *Final Determination*, Commerce revised the dumping margins to 84.93 percent for Allied Pacific and 82.27 percent for Yelin. 69 Fed. Reg. at 71,003.

On January 21, 2005, the ITC notified the Department that it completed its antidumping investigation of imports of certain frozen or canned warmwater shrimp from Brazil, Ecuador, India, Thailand, the PRC, and the Socialist Republic of Vietnam. *Letter from Stephen Koplan, Chairman, U.S. International Trade Commission, to The Honorable Donald L. Evans, Secretary of Commerce, Import Administration, U.S. Department of Commerce* 1 (Jan. 21, 2005) (Admin. R. Doc. No. 844) ("*ITC Final Determination Letter*"). Although the investigation covered "certain frozen and canned warmwater shrimp," the ITC determined that canned and non-canned warmwater shrimp and prawns exist as two different "domestic like products," *i.e.*, that they are produced by two separate U.S. industries. *Certain Frozen or Canned Warmwater Shrimp and Prawns from Brazil, China, Ecuador, India, Thailand, and Vietnam*, USITC Pub. 3748, Inv. Nos. 731-TA-1063-1068 (Final) at 16-17 (Jan. 2005) (Admin. R. Doc. No. 844). The ITC determined that the U.S. industry producing non-canned warmwater shrimp and prawns, but not the U.S. industry producing canned warmwater shrimp and prawns, is being materially injured by the subject merchandise from Thailand, the PRC, and the Socialist Republic of Vietnam sold in the United States at less than fair value. *ITC Final Determination Letter* 1. The scope of the antidumping duty order ultimately issued by Commerce, therefore, excludes canned warmwater shrimp. *Amended Final Determination and Order*, 70 Fed. Reg. at 5150.

On January 26, 2005, in response to the parties' allegations that Commerce made various ministerial errors in the *Final Determination*, Commerce amended the final determination to correct the final antidumping duty margin for Allied Pacific, to assign separate rates to four other respondents, and to recalculate the weighted average rate for all respondents entitled to a separate rate. *Memorandum from Julia Hancock & John D. La Rose, Case Analysts, to James C. Doyle, Office Director, AD/CVD Enforcement, Office 9* at 1 (Jan. 26, 2005) (Admin. R. Doc. No. 849) ("*Final Ministerial Error Memorandum*"); *see Amended Final Determination and Order*, 70 Fed. Reg. at 5150-51. Commerce calculated an amended final weighted average dumping margin of 80.19 percent for Allied Pacific. *Amended Final Determination and Order*, 70 Fed. Reg. at 5151.

On February 1, 2005, plaintiff Allied Pacific filed a summons and complaint challenging certain factual findings and legal conclusions by the Department in the *Final Determination* and the *Amended Final Determination and Order*. *Allied Pacific Compl.* at 1. On March 15, 2005, after receiving plaintiff Yelin's *Consent Motion to Consolidate, Joint Status Report, and Proposed Briefing Schedule* of March 11, 2005, the court consolidated Allied Pacific's and Yelin's cases (Court Numbers 05-00056 and 05-00074) under Court Number 05-00056. On April 4, 2005, plaintiffs moved for judgment on the agency record pursuant to USCIT R. 56.2.

### C. Positions of the Parties on the Surrogate Labor Rate

Plaintiffs argue that the Department's calculation of the surrogate labor value is unlawful and unsupported by substantial evidence. *Allied Pacific's Br.* at 4; *Yelin's Br.* at 39. Plaintiffs question the validity of the Department's regulation, 19 C.F.R. § 351.408(c)(3) (2004), under

which Commerce is required to "use regression-based wage rates reflective of the observed relationship between wages and national income in market economy countries." Plaintiffs assert that in calculating the surrogate labor value, Commerce violated 19 U.S.C. § 1677b(c)(4) by relying on data from countries that are neither economically comparable to China nor significant producers of the subject merchandise. *Allied Pacific's Br.* at 4. Plaintiffs argue that the Department's selection of surrogate values from a range of market economy countries pursuant to the regulation contravenes the statutory requirement that the surrogate value be derived from a country with a comparable level of development. *Id.* at 43; *see* 19 U.S.C. § 1677b(c)(4)(A). Plaintiffs maintain that Commerce, in its regression analysis, ignores many low-wage market economy countries and relies instead on data from market economy countries that are not comparable to China, such as Germany, Norway, Switzerland, and the United Kingdom. *Allied Pacific's Br.* at 41-44. Plaintiffs contend that pursuant to the regulation, Commerce calculated a labor wage rate of $0.93 per hour that is more than 600 percent higher than the actual Indian labor wage rate of $0.15 per hour. *Id.* at 42. In addition, plaintiffs argue that the Department's methodology violates 19 U.S.C. § 1677b(c)(4)(B) because it permits Commerce to rely on surrogate value data from market economy countries that are not significant producers of comparable merchandise. *Id.* at 43. Plaintiffs insist that Commerce should use publicly available, country-wide wage data from India. *Id.* at 44.

Plaintiffs argue that even if Commerce continues to apply the same regression-analysis methodology, Commerce still must modify the value used in this investigation. Plaintiffs assert that Commerce violated 19 C.F.R. § 351.408(c)(3), which requires that the calculation used to

determine the labor wage rate "be made available to the public" and "based on current data."

*Id.* at 44-46; *see* 19 C.F.R. § 351.408(c)(3).  Plaintiffs contend that Commerce never fully

disclosed the methodology used to calculate the labor wage rate, never corrected errors in the

calculation, and failed to use the most current available data in performing the regression-based

labor calculation.  *Allied Pacific's Br.* at 44-46.

Defendant explains that in the *Preliminary Determination*, in accordance with 19 C.F.R.

§ 351.408(c)(3), Commerce valued labor according to the regression-based wage rate for China

that was posted on the Department's website.  *Def.'s Mem. in Resp. to Pls.' Mots. for J. upon the*

*Agency R.* at 40 ("*Def.'s Mem.*"); *see Preliminary Determination*, 69 Fed. Reg. at 42,669.

Defendant states that Commerce recalculated the surrogate labor wage rate in the *Final*

*Determination*.  *Def.'s Mem.* at 40; *see Final Determination*, 69 Fed. Reg. at 71,003; *Issues and*

*Decision Memorandum* at 17-18.  Defendant further explains that Commerce used China's 2002

gross national income data to recalculate the regression-based wage rate as prescribed by its

regulations.  *Def.'s Mem.* at 40.  Defendant, however, acknowledges "that Commerce's

calculation of the labor wage rate may be erroneous and in need of recalculation."  *Id.*

Defendant therefore requests that the court remand to Commerce the valuation of the labor wage

rate.  *Id.*

### D.  Positions of the Parties on the Surrogate Value for Raw Shrimp

Plaintiffs contend that Commerce, when calculating the surrogate value of unprocessed

shrimp, disregarded contemporaneous, count-size-specific data in favor of data that are less

contemporaneous, less specific, and inherently flawed.  *Allied Pacific's Br.* at 4; *Yelin's Br.*

at 5-6. Plaintiffs also claim that the Department's surrogate value includes raw material other than shrimp and includes partially processed shrimp. *Allied Pacific's Br.* at 19-21; *Yelin's Br.* at 25-26, 35-36. They allege that the Department's selection of the Nekkanti financial statement data does not satisfy the requirement of 19 U.S.C. § 1677b(c)(1) to use the best available information when determining a surrogate value.

As mandatory respondents, plaintiffs Allied Pacific and Yelin had submitted proposed surrogate value data in response to the Department's March 12, 2004 request for this information. Plaintiffs provided SEAI "circulars" listing count-size-specific prices for raw shrimp from the Indian regions Andhra Pradesh and Tamil Nadu that are contemporaneous with the period of investigation. The data included count-size-specific prices for the dates of June 6, June 21, July 26, and August 9, 2003 for Andhra Pradesh; the data included count-size-specific prices for the period April through September 2003 for Tamil Nadu. *See Letter from Grunfeld, Desiderio, Lebowitz, Silverman & Klestadt LLP to Secretary of Commerce* at 3-4, Ex. 3 (May 21, 2004) (Admin. R. Doc. No. 267) ("*First Surrogate Value Submission*"). In addition, plaintiffs submitted data from *World Shrimp Farming 2003, Shrimp News International, No. 16* that lists Andhra Pradesh and Tamil Nadu as ranking first and fifth, respectively, among nine Indian states in production of farm-raised shrimp for 2002. *Id.* Ex. 3.

At various points during the investigation, plaintiffs maintained that the SEAI data were superior to the Nekkanti financial statement data under the Department's own identified criteria, *i.e.*, data that are publicly available, are contemporaneous with the period of investigation, represent a broad market average, are representative of prices in India, and are specific to the

input in question. *See Preliminary Determination*, 69 Fed. Reg. at 42,667-68. Plaintiffs argued during the investigation that the SEAI data reflect a broader purchasing experience than the Nekkanti financial statement data because the Nekkanti data reflect only the purchasing experience of a single producer operating in one of the Indian states included in the SEAI data, while the SEAI data reflect purchasing by several SEAI members in two important shrimp-producing Indian states, *i.e.*, Andhra Pradesh and Tamil Nadu. *See Issues and Decision Memorandum* at 5-7. Plaintiffs pointed out that the SEAI data were more specific to the actual raw material factor being valued than were the Nekkanti data. *See id.* at 6. Plaintiffs also argued that the SEAI data were contemporaneous, because the dates of the SEAI circulars all fell within the period of investigation, while the period covered by the Nekkanti financial statement predates the period of investigation. *Id.* at 6-7.

Petitioner also submitted surrogate value data. Petitioner calculated two proposed fresh shrimp surrogate values based on two different data sets. *See Letter from Dewey Ballantine LLP to Secretary of Commerce* at 2-3, Attach. 1 (May 21, 2004) (Admin. R. Doc. No. 269) ("*Ad Hoc Surrogate Value Submission*"). Petitioner stated that the data from the financial report of a Bangladeshi producer, Apex, were publicly available, audited, and contemporaneous with the first three months of the period of investigation. *Id.* Petitioner also provided a value based on the financial report of the Indian seafood producer, Nekkanti, which petitioner stated was publicly available and audited, although not contemporaneous with the period of investigation. *Id.* at 3.

On June 2, 2004, Allied Pacific and Yelin responded to the petitioner's surrogate value submission. Allied Pacific and Yelin criticized the data from the Nekkanti financial statement, emphasizing that it was not count-size-specific. *Letter from Grunfeld, Desiderio, Lebowitz, Silverman & Klestadt LLP to Secretary of Commerce* at 2 (June 2, 2004) (Admin. R. Doc. No. 337) ("*Comments on Petitioner's Surrogate Value Submission*"). Allied Pacific and Yelin argued that "[i]n the shrimp industry size or count is the single key factor that determines the price of the shrimp at all levels of trade, including raw material shrimp." *Id.* at 3. Respondents cited the pricing analysis in the *ITC Preliminary Determination* for the principle that "the larger the shrimp, the more expensive the price." *See ITC Preliminary Determination* at I-3 (stating that shrimp "are sold primarily on the basis of size"). Allied Pacific and Yelin emphasized that applying count-size-specific surrogate values enables the Department to calculate a more precise and accurate normal value and therefore, a more accurate dumping margin. *Comments on Petitioner's Surrogate Value Submission* at 3. Plaintiffs also argued, *inter alia*, that the Nekkanti data are suspect because they are not contemporaneous with the period of investigation and because it is unclear from Nekkanti's annual report whether the shrimp purchased is already processed, such that the use of the data in calculating a surrogate value for raw shrimp would result in double-counting of processing costs. *Id.* at 4. In addition, plaintiffs argued that Commerce has a practice of preferring country-wide data over company-specific data, such as the Nekkanti data, because country-wide data are more representative of the actual cost of the raw material. *Id.* at 4-5.

On June 4, 2004, petitioner Ad Hoc filed with Commerce a reply objecting to the surrogate value data based on the SEAI circulars that Allied Pacific and Yelin had submitted. *Letter from Dewey Ballantine LLP to Secretary of Commerce* 4-7 (June 4, 2004) (Admin. R. Doc. No. 356) ("*Letter Regarding Petitioner's Consultant*"). Ad Hoc argued that respondents Allied Pacific and Yelin, in submitting the SEAI circulars, did "*not* provide[] publicly available surrogate data . . . as required pursuant to agency regulation" and that "only publicly available data has the requisite indicia of reliability and transparency." *Id.* at 4-5 (emphasis in original). Ad Hoc also alleged that the data were suspect because SEAI was funding the defense of respondents in an antidumping investigation of shrimp from India. *Id.* at 4. Ad Hoc further argued that the data in the SEAI circulars are not contemporaneous because they corresponded to only four days within the last three months of the period of investigation. *Id.* at 7. Ad Hoc also claimed that the circular prices are not market prices because they do not result from actual sales transactions but instead are minimum prices set by a committee. *Id.* at 5-6. Ad Hoc contended that the most appropriate publicly available surrogate value data for raw shrimp was found in the audited financial statement of a Bangladeshi shrimp processor, Apex. *Id.* at 3.

On June 10, 2004, Commerce sent supplemental questionnaires to Allied Pacific and Yelin, requesting additional information regarding their surrogate value submissions and specifically regarding the SEAI data. *Letter from James C. Doyle, Program Manager, AD/CVD Enforcement III, to Allied Pacific Group & Yelin Enterprise Co. Hong Kong* at 3-4 (June 10, 2004) (Admin. R. Doc. No. 412). Plaintiffs first responded on June 15, 2004, objecting to petitioner's surrogate value information and requested that Commerce issue a supplemental

questionnaire requiring petitioner to address what plaintiffs regarded as the deficiencies in that

information.  *Letter from Grunfeld, Desiderio, Lebowitz, Silverman & Klestadt LLP to Secretary*

*of Commerce* at 2-3 (June 15, 2004) (Admin. R. Doc. No. 446) (proposing a list of questions for

a supplemental questionnaire).  Plaintiffs then responded on June 21, 2004, arguing that because

the SEAI data are count-size-specific, they are more accurate.  Plaintiffs also asserted that the

SEAI data are contemporaneous with the period of investigation, market-based, representative of

input prices in India, and publicly available.  *Letter from Grunfeld, Desiderio, Lebowitz,*

*Silverman & Klestadt LLP to Secretary of Commerce* at 2-7, Ex. 1 (June 15, 2004) (Admin. R.

Doc. No. 479) ("*Supplemental Questionnaire Response*").

On June 28, 2004, Commerce consulted the Secretary General of SEAI, Mr. Reddy

Raghuanath, regarding the count-size-specific surrogate value information that plaintiffs had

placed on the record in the form of SEAI circulars.  Commerce reported that the Secretary

General stated that the SEAI circulars represent "actual prices paid by SEAI members for fresh

raw shrimp (wild-caught) at the dock to fisherman [*sic*] as reported to SEAI by various

members." *Memorandum from James Doyle, Program Manager, Office IX, to The File* at 2

(June 28, 2004) (Admin. R. Doc. No. 510) ("*Memorandum on Conversation with SEAI Secretary*

*General*").  Commerce recounted the Secretary General's explanation that "the reported data

represented market based, private understandings between the buyers and the fishermen" and

that "prices are not shared with anyone outside the SEAI members as it could affect negotiations

between the exporters and fishermen." *Id.*  Commerce also reported that the Secretary General

stated that the prices from the SEAI circulars pertain to only two of India's nine maritime

provinces, which together account for approximately ten to eleven percent of India's fresh

shrimp purchases. *Id.* According to Commerce, the Secretary General stated that additional

circulars from the period of investigation probably existed; when asked to provide all the

circulars from the period of investigation, the Secretary General replied that he would call back.

*Id.*

Plaintiffs challenged petitioner's statements regarding the SEAI data, asserting that

petitioner made "numerous *factually inaccurate* and *misleading statements* regarding the raw

shrimp prices published by SEAI." *Letter from Grunfeld, Desiderio, Lebowitz, Silverman &*

*Klestadt LLP to Secretary of Commerce* at 2 (July 1, 2004) (emphasis in original) (Admin. R.

Doc. No. 522) ("*Letter to Commerce Defending SEAI Data*"). Allied Pacific and Yelin

challenged as false petitioner's assertions that the SEAI prices are set by committee, are

determined by collusion, are not compiled from actual past transactions, and do not reflect the

actual purchases of shrimp producers. *Id.* Plaintiffs cited the memorandum in which Commerce

reported that the Secretary General of SEAI informed Commerce that "the SEAI prices '*are*

*based on actual prices paid by SEAI members for fresh raw shrimp*' and that the reported data

represented *market-based price agreements* between fisherman [*sic*] and shrimp processors in

India." *Id.* (emphasis in original) (quoting *Memorandum on Conversation with SEAI Secretary*

*General* at 2).

### E. Commerce's Treatment of the Surrogate Value for Raw Shrimp

For the *Preliminary Determination*, Commerce rejected the SEAI data that plaintiffs

submitted and adopted as a surrogate value for raw shrimp a single, non-count-size-specific

value of $5.97 per kilogram that was calculated using the April 2002-March 2003 Nekkanti

financial statement data. Ad Hoc, the petitioner in the investigation, provided the Nekkanti

financial statement data and the calculated value. *See Preliminary Determination*, 69 Fed. Reg.

at 42,667-68; *Issues and Decision Memorandum* at 15-16. The Department declined to use data

pertaining to countries other than its chosen surrogate country, India. *Preliminary*

*Determination*, 69 Fed. Reg. at 42,667. Commerce therefore declined to use the data set from

the financial statement of the Bangladeshi producer Apex, which the petitioner submitted, and

the data set from Ecuador submitted by Shantou Red Garden Foodstuff Co., Ltd., a mandatory

respondent. *See Memorandum from John D. A. LaRose, Case Analyst, to The File* at 5-6 (July 2,

2004) (Admin. R. Doc. No. 529) ("*Preliminary Selection of Factor Values Memorandum*");

*Issues and Decision Memorandum* at 8, 13-15. Commerce chose the Nekkanti financial

statement data, which Commerce acknowledged is not count-size-specific, explaining that

Commerce did not have the same concerns regarding the Nekkanti data as it did regarding the

SEAI data. *Preliminary Determination*, 69 Fed. Reg. at 42,668. In rejecting the SEAI data,

Commerce recalled the affidavit of petitioner Ad Hoc's Indian market research consultant in

which the consultant asserted that the prices listed in the SEAI circulars are not market prices but

minimum prices provided to fresh shrimp suppliers. *Id.* at 42,667. Commerce also gave weight

to petitioner's argument that the SEAI prices pertain to only limited periods of time during the

period of review. *Id.* at 42,667-68.

Allied Pacific and Yelin subsequently submitted additional data sets for the calculation of

a raw shrimp surrogate value. *See Letter from Grunfeld, Desiderio, Lebowitz, Silverman &*

*Klestadt LLP to Secretary of Commerce* at 2 (Sept. 8, 2004) (Admin. R. Doc. No. 709) ("*Second Surrogate Value Submission*"). Plaintiffs submitted historical prices for raw, head-on shrimp that were published by the Aquaculture Certification Council, Inc. ("ACC") in India and that are available on the ACC's website.[4] *Id.* Ex. 3. Plaintiffs also provided publicly available, "ranged" purchase prices that two Indian companies, Nekkanti and Devi Sea Foods, Ltd. ("Devi"), had reported as actual prices paid for raw, head-on shrimp, in their roles as respondents in the parallel antidumping investigation of certain frozen and canned warmwater shrimp from India. *Id.* Attachs. 1-2. The actual sales prices were modified for public consumption according to 19 C.F.R. § 351.304(c) (2004), which allows a respondent to summarize its data by grouping ("ranging") the data within ten percent of the actual numerical figures.

In the *Final Determination*, Commerce rejected the additional data sets that plaintiffs submitted for the calculation of a surrogate value for shrimp. *See Final Determination*, 69 Fed. Reg. at 71,003; *Issues and Decision Memorandum* at 12-16. Regarding the new data sets that plaintiffs submitted, Commerce rejected the ACC data because Commerce concluded that the data were not sufficiently insulated from conflict of interest. *See Issues and Decision Memorandum* at 13. Commerce also rejected the publicly available ranged data from Nekkanti and Devi as inappropriate on the grounds that the record did not indicate the method for ranging the data. *Id.* Commerce observed that although the Commerce regulations at 19 C.F.R. § 351.304(c) allow ranging within ten percent of the actual figure, the exact method of ranging the data remains at the respondent's discretion. Commerce stated that because it did not know

---

[4] The website is accessible at *http://www.aquaculturecertification.org/accpric.html*.

how Nekkanti and Devi ranged their data, it could not precisely discern the original factor values

and that relying on the ranged data, therefore, would generate significant inaccuracies. *Id.* at 13-

14; *see also Def.'s Mem.* at 21-22, 30, 32.

Throughout the investigation, plaintiffs had emphasized the importance of count-size-

specific prices for shrimp, arguing that the value of shrimp is highly dependent on size; *i.e.*,

larger sizes of shrimp are worth significantly more, on a dollars-per-kilogram basis, in the

marketplace. *See*, *e.g.*, *Preliminary Determination*, 69 Fed. Reg. at 42,667 (recognizing the

parties' arguments regarding the importance of count-size-specific pricing); *Issues and Decision*

*Memorandum* at 15-16 (noting the parties' arguments and concluding that a count-size-specific

value would be preferable). For the *Final Determination*, Commerce acknowledged the

importance of count-size-specific values for shrimp and explained that although Commerce

rejected Allied Pacific and Yelin's count-size-specific data, Commerce nonetheless would

calculate count-size-specific factor values based on three sources of data on the record: the

Nekkanti financial statement data, from which Commerce calculated an "average" shrimp

surrogate value, "Urner Barry" pricing and market information, from which Commerce

established standard count sizes,[5] and the plaintiffs' shrimp-input-purchase-quantity information,

---

[5] Plaintiffs placed the Urner Barry data on the record to provide "U.S. wholesale prices of shrimp sourced from various markets around the world during the [period of investigation]." *Second Surrogate Value Submission* at 2, Ex. 2. "Urner Barry" is a publisher of pricing and other market information for various food industries, including the seafood industry. *Memorandum from Julia Hancock, International Trade Compliance Analyst, to The File* at 2 (Nov. 29, 2004) (Admin. R. Doc. No. 810). Urner Barry tracks the prices and ranges of "frozen, shell-on shrimp which have undergone a certain measure of processing." *Id.* at 3 n.1. Commerce recognized that the "Urner Barry information is not perfectly comparable to input shrimp used by Respondents" but noted that it used "this information to derive a standard count

from which Commerce related plaintiffs' count sizes to the standard count sizes. *Issues and Decision Memorandum* at 15-16; *Memorandum from Julia Hancock, International Trade Compliance Analyst, to The File* at 2 (Nov. 29, 2004) (Admin. R. Doc. No. 810) ("*Allied Pacific Final Determination Memorandum*"); *see also Allied Pacific's Br.* at 13-14; *Yelin's Br.* at 11.

Commerce explained that the Department first derived standard count-size ranges based on the Urner Barry data to harmonize the count-size ranges in respondents' data submissions. *Allied Pacific Final Determination Memorandum* at 2-3. Commerce then correlated the respondents' count-size ranges to the derived standard count-size ranges. *Id.* at 3. Commerce calculated a weighted average count size for the PRC based on respondents' purchased shrimp input quantities. *Id.* Commerce then set the weighted average purchase price of $5.97 equal to the weighted average count-size range of 31 to 40 shrimp per kilogram. *Id.* at 4. Commerce calculated the average price differential between count-size ranges. Based on this average price differential, Commerce adjusted the Nekkanti base price by 13.24 percent for the successive count-size ranges. *Id.* Referring to this six-step calculation, defendant insists that "Commerce's count size methodology, which relied upon the combination of three data sets that were the best available information on the record, produced the most accurate margin." *Def.'s Mem.* at 10.

In its response to the plaintiffs' ministerial error submissions, Commerce stated that its reliance on the Nekkanti financial statement data to value head-on, shell-on shrimp does not constitute a ministerial error and that Commerce "clearly and deliberately did not make an

size range, as well as the average percent difference between count sizes, [and] not to directly value input shrimp." *Id.*

adjustment for processed shrimp" purchases. *Final Ministerial Error Memorandum* at 9; *see Memorandum from Paul Walker, Case Analyst, to Edward Yang, Senior Enforcement Coordinator, China/NME Group* at 3-4 (Aug. 24, 2004) (Admin. R. Doc. No. 690) ("*Preliminary Ministerial Error Memorandum*"). Commerce explained that it chose the Nekkanti financial statement data because the raw materials purchased were labeled as "raw," which Commerce reasoned typically indicates head-on, shell-on shrimp because Nekkanti is a shrimp processor. *Preliminary Ministerial Error Memorandum* at 4. Commerce further explained that absent information to the contrary, Commerce assumed that Nekkanti would not purchase shrimp processed in the same manner that Nekkanti is capable of processing. *Id.* Commerce also stated that it found no information on the record of the proceeding that would enable it to make a reasonable adjustment for input purchases that were not head-on, shell-on shrimp. *Id.* at 4; *see Final Ministerial Error Memorandum* at 9 (referring to the *Preliminary Ministerial Error Memorandum*).

## II. STANDARD OF REVIEW

The court will uphold the Department's determination unless it is unsupported by substantial evidence on the record or otherwise not in accordance with law. *See* 19 U.S.C. § 1516a(b)(1)(B)(i) (2000). "Substantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938).

### III. DISCUSSION

A.  Pursuant to Defendant's Request, the Court Remands to Commerce the Valuation of the
Surrogate Labor Rate

As noted previously, defendant requests that the court remand to Commerce the issue of

the calculation of the labor wage rate.  *Def.'s Mem.* at 40.  Defendant requests 60 days to

complete the remand so that Commerce would have ample time to allow comments and to

reconsider the labor wage rate employed in the *Final Determination*.  *Id.*  The court grants

defendant's request for a voluntary remand and remands the *Final Determination* and the

*Amended Final Determination and Order* to Commerce to redetermine the surrogate value for

the labor wage rate, subject to the requirements of the Order accompanying this Opinion.  Under

the Order, Commerce must support its findings of fact concerning the surrogate value for the

labor wage rate by citing to specific evidence on the record and also must include an explanation

for the choices it makes from among the various alternatives it considers.

B.  The Department's Surrogate Value for Unprocessed Shrimp Is Unsupported by Substantial
Evidence on the Record and Inadequately Explained

The statute requires Commerce to "determine the normal value of the subject

merchandise on the basis of the value of the factors of production utilized in producing the

merchandise."  19 U.S.C. § 1677b(c)(1).  Commerce is to do so "based on the best available

information regarding the values of such factors in a market economy country or countries."  *Id.*

One of those factors of production consists of the "quantities of raw materials employed."

19 U.S.C. § 1677b(c)(3)(B).  During the investigation, the Department recognized that "the main

input, head-on, shell-on ("HOSO") shrimp, is an important factor of production in [the] dumping

calculation as it accounts for a significant percentage of normal value." *Preliminary Determination*, 69 Fed. Reg. at 42,667. Commerce was required to value, as a factor of production, the "quantities of raw materials employed," 19 U.S.C. § 1677b(c)(3)(B), which in this instance was unprocessed shrimp, using the "best available information" regarding the value of unprocessed shrimp in the chosen market economy country. Commerce, however, made no attempt to adjust its calculated surrogate value for the presence of raw material, as represented in the Nekkanti financial statement data, consisting of seafood other than shrimp or of partially processed shrimp.

Moreover, the Department's conclusion that the Nekkanti financial statement data set was the best available information, despite the apparent yet unaddressed inadequacies of that data set, is unsupported by substantial evidence on the record and unsatisfactorily explained. Commerce identified several criteria it considered indicative of best available information, including whether the data are publicly available, are contemporaneous with the period of investigation, represent a broad market average, are representative of prices in the surrogate country, are specific to the input in question, and are sufficiently insulated from conflict of interest. The Department, however, did not justify adequately its choice of the Nekkanti financial statement data over the various alternatives according to those criteria and according to the record evidence.

1. The Record Lacks Substantial Evidence to Establish that the Raw Material Data in Nekkanti's Financial Statement Excluded Seafood Other than Shrimp and Partially Processed Shrimp

Commerce did not identify substantial evidence on the record to support a finding that the Nekkanti financial statement data included only purchases of raw, head-on, shell-on shrimp,

or that those data specifically excluded seafood other than shrimp and partially processed

shrimp.

### a. The Record Lacks Substantial Evidence to Establish that the Raw Material Data in Nekkanti's Financial Statement Excluded Seafood Other than Shrimp

A document in the administrative record shows that early in the investigation Commerce

set out to calculate the surrogate value for raw, head-on, shell-on shrimp by "divid[ing] the total

quantity of *shrimp* purchased by Nekkanti . . . by the price Nekkanti paid for the fresh *shrimp*"

and then converting that amount from Indian rupees to U.S. dollars to arrive at the value of

$5.9713 per kilogram. *Preliminary Selection of Factor Values Memorandum* at 3 (emphasis

added). Exhibit 3 of the *Preliminary Selection of Factor Values Memorandum* shows a prepared

table entitled "Fresh Shrimp" with a "Total Value" in rupees of 1,387,296,413, a "Total

Quantity" in kilograms of 5,202,000, an "Inflator" of 1.04, and an "Exchange Rate" of 0.02 U.S.

dollars per Indian rupee. Commerce, however, used data on Nekkanti's raw material purchases

without first establishing, through record evidence, that the data it used for the surrogate value

calculation actually were confined to purchases of raw, head-on, shell-on shrimp. *Id.* At oral

argument, defendant did not dispute that the Nekkanti financial statement data appear to pertain

to quantities of seafood that are not confined entirely to shrimp. Defendant argued, instead, that

Commerce could infer from Nekkanti's role in the Department's parallel investigation of shrimp

from India that Nekkanti is a major shrimp producer and that the Department's reliance on the

Nekkanti data was supported by substantial evidence and in accordance with law.

The Department's treatment of the Nekkanti financial statement data as if it were

confined to purchases of raw, head-on, shell-on shrimp was a fundamental error. The prepared

table in Exhibit 3 of the *Preliminary Selection of Factor Values Memorandum* provides the

values that Commerce relied upon to calculate the base value of $5.9713 per kilogram. The table

is entitled "Fresh Shrimp." The values appearing in the table, however, correspond to a chart in

Nekkanti's financial statement in which the material is described as "Raw Material Consumed

for Processing." *Nekkanti Sea Foods Limited*, *19th Annual Report 2002-2003* at 23 (2003)

(found at *Preliminary Selection of Factor Values Memorandum* Ex. 3). Commerce did not

identify in the *Preliminary Determination* or the *Final Determination*, and defendant does not

direct the court to, anything in the Nekkanti financial statement showing that the values of raw

material purchased refer exclusively to raw, head-on, shell-on shrimp. To the contrary, the

Nekkanti sales brochure on the record states that Nekkanti processes and sells species other than

shrimp, including "Deep Sea Lobsters (whole and tails), Crabs (whole and cut forms), Cuttle

Fish (onboard frozen – whole, whole cleaned and fillets), Fin Fishes – King Fish, Pomfret,

Snappers (whole, gutted and fillets)." *Letter from Grunfeld, Desiderio, Lebowitz, Silverman &

Klestadt LLP to Secretary of Commerce* at 11 (Oct. 19, 2004) (Admin. R. Doc. No. 759) ("*Allied

Pacific Case Br.*"); *Letter from Grunfeld, Desiderio, Lebowitz, Silverman & Klestadt LLP to

Secretary of Commerce* at 11 (Oct. 19, 2004) (Admin. R. Doc. No. 758) ("*Yelin Case Br.*");

*Second Surrogate Value Submission* Attach. 8 (providing Nekkanti's sales brochure).

        Commerce acknowledged plaintiffs' concerns regarding the non-shrimp content of the

Nekkanti data. *See Issues and Decision Memorandum* at 6. Commerce also noted petitioner

Ad Hoc's assertion that "the financial statement 'shows unmistakably that only in-scope shrimp

was processed by the company' in the 2002-2003 period.'" *Id.* at 12 (quoting the comments of

petitioner Ad Hoc).  Commerce cited the petitioner's argument that in valuing the raw material

input, *i.e.*, raw, head-on, shell-on shrimp, Commerce had broad discretion to rely upon the best

available information that was publicly available.  *Id.* at 11.  Commerce, however, never cited to

any record evidence to substantiate Ad Hoc's assertion that the Nekkanti financial statement data

reflected only purchases of "in-scope" shrimp.[6]  Rather than addressing plaintiffs' objections that

the Nekkanti data included seafood other than shrimp, Commerce invoked its broad discretion to

choose the best available information and pointed to alleged deficiencies in the other data

submissions.  *See id.* at 12-16.

  b.  The Record Lacks Substantial Evidence to Establish that Nekkanti's Shrimp Purchases Were
                          Confined to Unprocessed Shrimp

Commerce also erred in treating the Nekkanti financial statement data as if the data were

confined to purchases of unprocessed shrimp.  The record evidence instead establishes that some

of Nekkanti's purchases were of shrimp that had been partially processed.

Plaintiffs argued during the investigation, and again before the court, that Nekkanti's raw

shrimp purchases were not an appropriate basis to calculate surrogate factor values because

Nekkanti purchased headless, shell-on shrimp or peeled and undeveined shrimp in addition to

raw, head-on, shell-on shrimp.  *See Allied Pacific Case Br.* at 12; *Yelin Case Br.* at 11-12; *Allied*

*Pacific's Br.* at 20-21; *Yelin's Br.* at 25-26, 35.  Allied Pacific asserted that it was inappropriate

---

[6] Because the scope of the investigation is not confined to raw, head-on, shell-on shrimp,
petitioner's assertion does not address entirely the issue of the composition of the purchases
represented by the Nekkanti financial statement data.  The scope of the antidumping duty order
necessarily includes a broader category of products than a raw material input because the raw
material input is but one component of the subject merchandise.

to compare Nekkanti's semi-processed raw shrimp purchases to Allied Pacific's raw shrimp purchases that were all purchases of head-on, shell-on shrimp because doing so artificially inflates the overall input purchase value and results in double-counting of processing expenses. *Allied Pacific Case Br.* at 12; *Yelin Case Br.* at 12; *see Allied Pacific's Br.* at 20-21; *Yelin's Br.* at 25, 35-36. Plaintiffs argue that purchases of headless and peeled shrimp further distort the surrogate factor value by artificially reducing the quantity by weight, pointing out that headless and peeled shrimp weigh less than head-on, shell-on shrimp. *Allied Pacific Case Br.* at 13; *Yelin Case Br.* at 13; *Allied Pacific's Br.* at 20; *Yelin's Br.* at 35-36. Commerce acknowledged these arguments but did not directly address them. *See Issues and Decision Memorandum* at 6.

Commerce concluded that because Nekkanti processes shrimp, its raw shrimp material purchases must consist of head-on, shell-on shrimp. Record evidence does not support this conclusion. Plaintiffs placed data on the record from the parallel antidumping investigation for India, in which Nekkanti reported its raw shrimp purchases. Plaintiffs argue that the data show that Nekkanti bought significant quantities of headless shrimp and peeled shrimp. *Allied Pacific Case Br.* at 12; *Yelin Case Br.* at 11-12. Plaintiffs contend that the purchased amounts of these partially processed shrimp ranged from more than 20 percent of all of Nekkanti's shrimp purchases by quantity to more than 30 percent of its shrimp purchases by value. *Allied Pacific Case Br.* at 12; *Yelin Case Br.* at 12; *see Second Surrogate Value Submission* Attach. 1, Ex. SD-3; *Letter from Grunfeld, Desiderio, Lebowitz, Silverman & Klestadt LLP to Secretary of Commerce* at 5-6, (Dec. 7, 2004) (Admin. R. Doc. No. 825) ("*Ministerial Error Allegations*"); *Allied Pacific's Br.* at 20; *Yelin's Br.* at 25, 35. In the *Second Surrogate Value Submission*, the

Nekkanti purchasing data that plaintiffs placed on the record show a substantial number of

purchases of shrimp that are identified with abbreviations beginning with the letters HL for

"headless" as opposed to HO for "head-on": "HLBT, "HLSO," HLFLOWER, "HL PVN,"

"HLBROWN," "HLP," "HLTIGER," and "HLWHITE." *Second Surrogate Value Submission*

Ex. SD-3. Nekkanti's own submissions in the parallel antidumping investigation corroborate

that Nekkanti purchased semi-processed shrimp during the period of this investigation. *See*

*Allied Pacific Case Br.* at 12 ("Nekkanti has stated on the record that '[w]hile many raw material

purchases were headless shell on raw shrimp, certain purchases were of head-on shrimp or

peeled and undeveined.'" (quoting *Second Surrogate Value Submission* Attach. 1 and Nekkanti's

April 14, 2004 Section D Response at D-18)).

The record, therefore, does not support a finding that the Nekkanti financial statement

data pertain exclusively to unprocessed shrimp. Nor is there support for an implicit finding that

the raw material purchases represented in the Nekkanti financial statement data that consisted of

raw material other than unprocessed shrimp did not significantly distort the surrogate values that

the Department calculated. Because of the "best available information" requirement of

19 U.S.C. § 1677b(c)(1), the base surrogate value of $5.97 per kilogram and the size-adjusted

values that Commerce calculated from that base value must be rejected by the court as

insufficiently explained and unsupported by substantial evidence on the record.

2. The Use of the Data in the Nekkanti Financial Statement Is Inconsistent with Commerce's
Own Criteria for "Best Available Information"

Plaintiffs challenge the Department's reliance on the Nekkanti financial statement data,

which in plaintiffs' view are "not corroborated by any other evidence on the administrative

record" and yield an "aberrational and illogical" surrogate value. *Allied Pacific's Br.* at 2; *see Yelin's Br.* at 28-31. Plaintiffs point out that the base price of $5.97 per kilogram generated from the Nekkanti financial statement data and the derived count-size-specific values are substantially higher than the values for unprocessed shrimp shown in other data sets that are a part of the administrative record. *Allied Pacific's Br.* at 2; *see Yelin's Br.* at 28-31. The court finds that Commerce failed to support with substantial evidence its selection of the Nekkanti financial statement data as the best available information from among the various alternatives that were available on the record.

Commerce had four sets of data, *inter alia*, from which to choose: count-size-specific prices for raw, head-on shrimp listed in the circulars of the SEAI; surveys of count-size-specific prices paid for unprocessed shrimp by Indian shrimp packers and exporters during the period of investigation that the ACC collected and published; public, ranged versions of count-size-specific prices paid for unprocessed shrimp reported by Nekkanti and Devi to Commerce in the parallel antidumping duty investigation of frozen and canned shrimp from India; and the Nekkanti financial statement data, which were average, tax-inclusive costs of purchases of seafood products as listed in the financial statement of the Indian shrimp producer Nekkanti for the period of April 2002 to March 2003, which period was immediately prior to the period of investigation. *First Surrogate Value Submission* at 3-4, Ex.3; *Second Surrogate Value Submission* at 2. Commerce rejected the SEAI data, the ACC data, and the data on the Nekkanti and Devi ranged prices. *Issues and Decision Memorandum* at 13-15. Commerce based the surrogate value for raw shrimp on the Nekkanti financial statement data, which petitioner

submitted, in the *Preliminary Determination* and the *Final Determination*. *Preliminary*

*Determination*, 69 Fed. Reg. at 42,667-68; *Issues and Decision Memorandum* at 15-16.

Commerce assigned the value of $5.97 per kilogram, calculated from the Nekkanti

financial statement data, to the weighted average count size of 31 to 40 shrimp per kilogram.

The court's review of the record shows that for unprocessed shrimp falling within the count size

of 31 to 40 shrimp per kilogram, the SEAI values vary from $4.38 to $5.37 per kilogram, the

ACC value is $5.05 per kilogram, and the ranged Devi/Nekkanti values vary from $5.08 to $6.22

per kilogram.[7] *See Allied Pacific Case Br.* Ex. 1.

In selecting data to value factors of production, Commerce must choose "the *best*

*available information* regarding the values of such factors in a market economy country or

countries." 19 U.S.C. § 1677b(c)(1) (emphasis added). Congress did not define the term "best

available information," and the statute vests Commerce with considerable discretion. *See Nation*

*Ford Chem. Co. v. United States*, 166 F.3d 1373, 1377 (Fed. Cir. 1999). "'[T]he process of

constructing foreign market value for a producer in a nonmarket economy country is difficult

---

[7] The values obtained from the ACC data and the ranged Nekkanti/Devi data do not include the values of $7.09 per kilogram or $7.07 per kilogram for the count-size range of 27-31 because only one of the five count sizes included in that range falls within the average range derived by Commerce of 31-40 shrimp per kilogram. The remaining four count sizes, 27-30 shrimp per kilogram, are for significantly larger shrimp and therefore significantly larger values. Inclusion would overstate the relevant value range. In addition, the spreadsheet provided at Exhibit 1 of administrative record document number 709 lists an erroneous Nekkanti/Devi value of $5.58 per kilogram for the count-size range of 39-43 shrimp per kilogram. The worksheet showing the calculation, also at Exhibit 1, provides the correct value of $5.08 per kilogram. Finally, the court notes that the values listed in the chart provided on page 52 of *Allied Pacific Br.*, which purport to show raw shrimp prices based on the SEAI, ACC, and ranged Nekkanti/Devi data, appear to be inconsistent with the evidence on the record.

and necessarily imprecise.'" *Id.* (quoting *Sigma Corp. v. United States*, 117 F.3d 1401, 1408

(Fed. Cir. 1997)). "While § 1677b(c) provides guidelines to assist Commerce in this process,

this section also accords Commerce wide discretion in the valuation of factors of production in

the application of those guidelines." *Id.* The Department's exercise of its discretion to

determine "best available information," however, must be guided by the larger purpose of the

antidumping law. "The Act sets forth procedures in an effort to determine margins 'as

accurately as possible.'" *Lasko Metal Prods., Inc. v. United States*, 43 F.3d 1442, 1446 (Fed.

Cir. 1994) (quoting *Rhone Poulenc, Inc. v. United States*, 899 F.2d 1185, 1191 (Fed. Cir. 1990));

*see also Shakeproof Assembly Components, Div. of Ill. Tool Works, Inc. v. United States*, 268

F.3d 1376, 1382 (Fed. Cir. 2001).

In the investigation, Commerce stated that "[a]s a general matter, the Department prefers

to use publicly available data to value surrogate values from the surrogate country to determine

factor prices that, among other things: represent a broad market average; are contemporaneous

with the [period of investigation]; and are specific to the input in question." *Preliminary*

*Determination*, 69 Fed. Reg. at 42,667. The criteria that Commerce identified during the

investigation appear to be related to the objective of accuracy. However, selecting the surrogate

value data that yield the most accurate dumping margin necessarily requires Commerce to

conduct a fair comparison of the data sets on the record. Commerce failed to do so in this

investigation. Commerce concluded that the count-size-specific values that the Department

derived from the Nekkanti financial statement data "are more appropriate than values submitted

by Respondents because the Department's data and methodology are publicly available." *Issues*

*and Decision Memorandum* at 16.  Commerce explained that the Department recognized the importance of count-size-specific data and therefore derived count-size-specific surrogate values based on the Nekkanti financial statement data.  Commerce further explained that it used the Urner Barry data to set standard count-size ranges when extrapolating from the $5.97 Nekkanti financial statement base value because the Urner Barry data is "fully contemporaneous with the period of investigation," "represents a broad market average," and "has the advantage of being insulated from potential conflicts of interest."  *Id.*  Commerce discredited the various forms of surrogate value information that plaintiffs submitted, identifying what it considered to be deficiencies, without explaining adequately how the Nekkanti financial statement data that petitioner submitted, and Commerce accepted for use, were superior to these alternative sets of data according to the Department's own criteria.  *See id.* at 13-15.

The Supreme Court has "frequently reiterated that an agency must cogently explain why it has exercised its discretion in a given manner . . . ."  *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 48 (1983).  "[T]he agency must explain the evidence which is available, and must offer a 'rational connection between the facts found and the choice made.'"  *Id.* at 52 (quoting *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962)).  Commerce failed to consider whether the surrogate values derived from the Nekkanti financial statement data were aberrational when compared to the surrogate values derived from the other data sets.  Throughout the investigation, Commerce rejected the data sets placed on the record by the respondents, justifying the rejection on the grounds that the data sets did not meet one or more of the criteria that Commerce identified.  When the data sets are compared according to the

record evidence, however, the Nekkanti financial statement data appear to be the least satisfactory under the Department's own criteria. Nevertheless, Commerce used the Nekkanti financial statement data to calculate the base surrogate value and then, recognizing the importance of count size, went to some length to develop a complicated procedure for estimating count-size-specific shrimp values based on the single value of $5.97 per kilogram.

a. Commerce Has Failed to Explain Adequately Why the Nekkanti Financial Statement Data Are Superior to the SEAI Data under its Own Criteria

Commerce, in evaluating whether a data set is the best available information for determining surrogate values, has applied criteria, as discussed above, that include whether the data are publicly available, are contemporaneous with the period of investigation, represent a broad market average, are representative of prices in the surrogate country, and are specific to the input in question. *See Preliminary Determination*, 69 Fed. Reg. at 42,667-68. In rejecting the SEAI data, Commerce stated that "although the Department would prefer to use count-size specific surrogate values for the raw shrimp input, the Department finds that the only count-size specific surrogate value submitted by the Respondents is not the most appropriate basis for valuing the raw shrimp input because it is not publicly available, does not represent a broad market average, has [not] been shown to be representative of prices in India and does not contain prices for certain count-size ranges used by the Respondents." *Preliminary Determination*, 69 Fed. Reg. at 42,668; *see Issues and Decision Memorandum* at 13-16.

### i. Public Availability

Commerce failed to provide an adequate explanation of what public availability means in the context of selecting data for the calculation of surrogate values, why it deemed the SEAI data not to be publicly available in that context, and why a determination that the SEAI data are not publicly available precludes use of that data set. Regarding public availability, plaintiffs argued that the SEAI prices are publicly available because they are on the public record of the proceeding and because SEAI readily provided plaintiffs with the SEAI circulars. In the alternative, plaintiffs stated that even if not considered by Commerce to be publicly available, the SEAI data should not be disqualified because public availability is not required but merely preferred. *See Issues and Decision Memorandum* at 7. The Department's rejection of the SEAI data raises the issues of what constitutes public availability and whether surrogate value data *must* be publicly available.

The Commerce regulations, in 19 C.F.R. § 351.408(c)(1), use the term "publicly available information" without defining it. In the investigation, Allied Pacific cited 19 C.F.R. § 351.105(b)(1) (2004), which defines public information as, *inter alia*, "factual information of a type that has been published or otherwise made available to the public by the person submitting it." *Supplemental Questionnaire Response* at 5-6. The court is not convinced that 19 C.F.R. § 351.105(b)(1) is pertinent. The term used in that provision is "public information," not "publicly available information" (the term used in 19 C.F.R. § 351.408(c)(1)). Moreover, the context of § 351.105(b)(1) is the Department's distinguishing public information from

proprietary information that the Department will regulate under an Administrative Protective Order.

Allied Pacific and Yelin argue that placement of data on the public record in the investigation should cause such data to be considered to be publicly available. *See Allied Pacific's Br.* at 28; *Yelin's Reply Br.* at 3; *Def.'s Mem.* at 36. As to the public availability of the SEAI data, plaintiffs contended that the SEAI prices are available upon request and that its researchers obtained the prices "through an informal request and without having membership in SEAI or any other organization." *Supplemental Questionnaire Response* at 5-6. Plaintiffs explained that their researchers contacted the various SEAI offices in each of the shrimp producing regions of India and that the SEAI offices in the Indian regions of Andhra Pradesh and Tamil Nadu were the only ones to respond. *Id.* at 5. Commerce, however, relied on an affidavit that the petitioner's own Indian market research consultant executed; according to Commerce, the consultant stated that SEAI does not collect or publish to the public at large any count-size-specific fresh shrimp pricing information. Ad Hoc asserted that SEAI provides those prices only to its members. *Preliminary Determination*, 69 Fed. Reg. at 42,667; *see also Preliminary Selection of Factor Values Memorandum* at 3.

During the investigation, Allied Pacific and Yelin challenged the credibility of the petitioner's consultant, highlighting the inconsistency between the information that Commerce obtained directly from the SEAI Secretary General and the information in the consultant's affidavit. *Letter to Commerce Defending SEAI Data* at 2. The court notes inconsistencies in the record evidence obtained from the SEAI Secretary General and from petitioner's consultant.

Plaintiffs cited the Department's summary of the telephone conversation between a Commerce official and the SEAI Secretary General on June 28, 2004, in which the SEAI Secretary General informed Commerce that the SEAI prices "are based on actual prices paid by SEAI members for fresh raw shrimp" and that "[t]hese prices are only provided to members of SEAI about once a month through the circulars for purposes of providing price references for fresh shrimp purchased by SEAI members." *Id.* Attach. 1 at 2; *Memorandum on Conversation with SEAI Secretary General* at 2. The petitioner's consultant, however, reported that he spoke to an SEAI official on April 23, 2004, who informed him that SEAI does not collect and therefore does not provide any count-specific pricing information, and that SEAI provides only formulaic, not actual, pricing information to guide exporters in setting a minimum price. *Letter Regarding Petitioner's Consultant* Attach. 2. Petitioner's consultant did not specify which SEAI office he called or from which SEAI official he obtained information. Commerce did not address the discrepancy between the information provided by the petitioner's consultant and the information obtained from the SEAI Secretary General by Commerce itself.

Commerce deemed the SEAI information not to be publicly available and rejected it on that ground. However, Commerce, in doing so, did not explain adequately what public availability means in the context of considering data for use in calculating surrogate values. Commerce also failed adequately to explain why, in the circumstance presented, the SEAI data must be publicly available in order to be used for calculating a surrogate value. In its memorandum explaining the selection of factor values for Allied Pacific and Yelin, Commerce emphasized that it used publicly available information, pursuant to 19 U.S.C. § 1677b and

19 C.F.R. § 351.408.  *Preliminary Selection of Factor Values Memorandum* at 1.  The statute, in

19 U.S.C. § 1677b(c), does not require Commerce to use publicly available information to value

the factors of production.  The regulations, in 19 C.F.R. § 351.408, provide that Commerce

"*normally* will use publicly available information to value factors."  19 C.F.R. § 351.408(c)(1)

(emphasis added); *see also Preliminary Determination*, 69 Fed. Reg. at 42,668 (noting that "the

Department *practice* is to rely on publicly available data" (emphasis added)).  As plaintiff Allied

Pacific argues, however, the regulation does not *require* Commerce to use publicly available

information.  *Allied Pacific's Reply Br*. at 3-4.  Commerce explained that public availability

serves to provide "accurate information accepted by the market" and "represents a reliable

source insulated from conflicts of interest."  *Issues and Decision Memorandum* at 13.

Commerce noted the respondents' arguments that the purpose of public availability is to support

the calculation of the most accurate dumping margin and that Commerce had used non-public

information in prior cases.  *Id.* at 7.  Moreover, defendant acknowledges that the regulation

identifies use of publicly available information as a matter of preference rather than as a

requirement.  *Def.'s Mem.* at 18.  By including the word "normally" in the language of the

regulation, 19 C.F.R. § 351.408(c)(1), Commerce itself has indicated that the use of publicly

available information will be considered on a case-by-case basis and thereby subjected to

analysis by the agency.[8]  Accordingly, the agency's own regulation contemplates an explanation,

based on the record in this case, of why the particular information was chosen.

Even were it assumed, *arguendo*, that the SEAI data were not publicly available for

purposes of 19 C.F.R. § 351.408(c)(1), the *Final Determination* still would contain an

inadequate explanation for the choice of the Nekkanti financial statement data over the SEAI

data and other available alternatives solely on the basis of public availability.  In nonmarket

economy investigations, Commerce at times has relied upon actual prices paid for inputs on the

international market in combination with surrogate values.  While the actual prices paid on

international markets are not offered here, the use of such prices in other cases demonstrates the

balancing of the need for accurate pricing information with the preference for the public

availability of that information.  As the United States Court of Appeals for the Federal Circuit

has explained in *Lasko Metal Products, Inc.*, 43 F.3d at 1446, actual prices paid for inputs on the

---

[8] The 1996 revision of the regulation further indicates that the public availability standard under 19 C.F.R. § 351.408(c) is a preference and not a requirement.  In 1996, Commerce relaxed the publication standard to "enable[] the Department to achieve greater accuracy when information on the specific factor can be derived outside of published sources." *Antidumping Duties; Countervailing Duties*, 61 Fed. Reg. 7308, 7344 (proposed Feb. 27, 1996) (final rule at 62 Fed. Reg. 27,295, 27,343 (May 19, 1997) ("providing for the submission of publicly available information to value factors under § 351.408(c)")).  Commerce revised the regulation to "drop[] the preference for published information, limiting the preference to publicly available information," a more flexible standard. *Id.*  Commerce explained that the revision was "not meant to preclude the Department from using published information.  Instead, it [wa]s intended to reflect the Department's preference for input specific data over the aggregated data that frequently appear in published statistics." *Id.*

international market are more accurate and indicative of actual input cost than surrogate values and therefore are preferable as they yield a more accurate dumping margin. Actual input prices paid, however, are not necessarily public information. Yet, in *Lasko Metal Products, Inc.*, the Federal Circuit approved the Department's mixed methodology of using actual prices paid by respondents for inputs on international markets and resorting to surrogate factors where market-based values were unavailable. *Id.* at 1445. Concerning that mixed methodology, Commerce did not condition its reliance on the actual prices paid by respondents upon a finding that those prices were publicly available.

In applying the preference for publicly available data, Commerce must balance the interests of transparency and verifiability that are served by public availability with other considerations, including the desirability of data that are as specific as possible to the raw material being valued. As defendant has acknowledged, "[n]o one determinative factor makes a particular data source better than another for valuing raw shrimp." *Def.'s Mem.* at 16. Yet, the data chosen by Commerce to generate the base surrogate value were not contemporaneous with the period of investigation, represented purchases of a single producer rather than a broad market average, were not count-size specific, and cannot be shown to have excluded purchases of seafood other than shrimp and of processed shrimp.

## ii. Other Criteria

In addition to finding that the SEAI data were not publicly available, Commerce had stated in the *Preliminary Determination* that the SEAI data were "not the most appropriate basis for valuing the raw shrimp input" because that information "does not represent a broad market

average, has [not] been shown to be representative of prices in India and does not contain prices for certain count-size ranges used by the Respondents." *Preliminary Determination*, 69 Fed. Reg. at 42,668; *see Issues and Decision Memorandum* at 15.  Commerce, however, did not include in the *Preliminary Determination* or the *Final Determination* a discussion comparing the SEAI data to the Nekkanti financial statement data under each of these criteria.

Although expressing a preference for data that are contemporaneous with the period of investigation, Commerce apparently ignored this criterion when evaluating the SEAI data. Record evidence demonstrates that the SEAI data are contemporaneous with the period of investigation, April 1, 2003 through September 30, 2003, while the Nekkanti financial statement data are not.  The SEAI data included count-size-specific prices for the dates of June 6, June 21, July 26, and August 9, 2003, and for the period of April through September 2003.  *See Preliminary Determination*, 69 Fed. Reg. at 42,668.  The Nekkanti financial statement data, however, predated the period of investigation, covering the period April 2002 through March 2003.  *Id.*

Commerce first examined the SEAI data to determine whether the average prices listed in the SEAI circulars provided a sufficiently broad sample of input prices to reflect a reliable market average of raw, unprocessed shrimp purchases in India.  Commerce found that the SEAI data for the Andhra Pradesh region provided pricing data only for select time periods within the period of investigation.  *Id.*  Commerce further found that the SEAI data for the Tamil Nadu region, while providing average prices for the period April through September 2003, did not include supporting documentation to show how those price averages were derived, *e.g.*, whether

the price averages were based on data collected on a daily, weekly, or monthly basis. *Id.* The

Nekkanti financial statement data, however, similarly lacks supporting documentation.

Apparent flaws in the Nekkanti financial statement data undermine a conclusion that the

base value derived from those data represents a broad market average for the actual input being

valued. As discussed above, substantial record evidence indicates that the Nekkanti financial

statement data included purchases of other seafood and of partially processed shrimp. Thus, the

record evidence fails to support a determination that the base value of $5.97 per kilogram is a

broad market average for purchases of unprocessed shrimp. The record evidence indicates, at

best, that the base value of $5.97 per kilogram is an average of the raw material purchases of a

single Indian seafood producer that is a major producer of shrimp. Moreover, the average value

of $5.97 per kilogram was not derived from an actual count-size range. Because the Nekkanti

data provided Commerce only with an average price for "Raw Material Consumed for

Processing," Commerce, as noted previously, conducted a complex, six-step calculation using

two additional data sets to correlate this average price to the count-size range of 31 to 40 shrimp

per kilogram and to extrapolate this average price to other count sizes. *See Issues and Decision

Memorandum* at 15-16; *Allied Pacific Final Determination Memorandum* at 3-4. Commerce has

not provided a sufficient explanation of how the most reliable market average based on the

record evidence could result from its complicated method of assigning a count size to the base

value of $5.97 per kilogram and deriving other count-size values from that base value.

Commerce did not offer substantial evidence to support a determination that the Nekkanti

financial statement data better represent a broad market average than do the SEAI data.

While the Department's explanations are far from clear, Commerce's implicit statement that the SEAI data are not representative of prices in India seems to refer to a conflict in the information on the record as to the percentage of shrimp production that occurs in the Indian regions represented in the SEAI data, *i.e.*, Andhra Pradesh and Tamil Nadu. *Preliminary Determination*, 69 Fed. Reg. at 42,668. Commerce cited the respondents' submission in which they reported that the SEAI data, which covers the regions Andhra Pradesh and Tamil Nadu, account for over 55 percent of India's shrimp production. *Id.* Commerce also cited the SEAI Secretary General's statement that the two regions account for 10 to 11 percent of India's shrimp purchases. *Id.* Commerce concluded that it was unclear how to reconcile the numbers and "[t]herefore, the representativeness of the Andarah [*sic*] Pradesh and Tamil Nadu regions of India's shrimp industry as a source for a shrimp surrogate value is unreliable." *Id.* On this issue, Commerce did not compare its findings regarding the SEAI data to the Nekkanti financial statement data. Nekkanti is a single producer located in the Andhra Pradesh region. If data from the regions of Andhra Pradesh and Tamil Nadu are not considered to be sufficiently representative of Indian shrimp production, the Nekkanti financial statement data must be even less so, because Nekkanti, according to the record evidence, is but one company operating in one of those two regions. Record evidence does not support the conclusion that the Nekkanti financial statement data are more representative of prices in India than are the SEAI data.

Commerce does not clearly state a finding as to whether the SEAI data reflect actual market prices of unprocessed shrimp. It is possible that Commerce credited the statement in the affidavit of Ad Hoc's consultant that SEAI provides only formulaic, not actual, pricing

information to guide exporters in setting a minimum price. *Letter Regarding Petitioner's Consultant* Attach. 2.  However, if this is so, Commerce failed to explain why it gave credibility to the consultant's characterization of information, which the consultant stated he had obtained from an unnamed SEAI official, and gave no credibility to information that Commerce described as having itself obtained from the SEAI Secretary General. *See id.*; *Memorandum on Conversation with SEAI Secretary General* at 1.  Commerce reported that the Secretary General stated that the SEAI circulars represent "actual prices paid by SEAI members for fresh raw shrimp (wild-caught) at the dock to fisherman [*sic*] as reported to SEAI by various members." *Memorandum on Conversation with SEAI Secretary General* at 2.

In rejecting the SEAI data, Commerce also stated that the SEAI information "does not contain prices for certain count-size ranges used by the Respondents." *Preliminary Determination*, 69 Fed. Reg. at 42,668; *see Issues and Decision Memorandum* at 15.  The objection to lack of precise correlation for count sizes rings hollow given the absence of any count-size specificity in the Nekkanti financial statement data.  The base surrogate value of $5.97 per kilogram that Commerce calculated from the Nekkanti financial statement data is not specific for count size.  While Commerce recognized that both petitioner and respondents had argued that "count size is an important factor," Commerce rejected all count-size-specific prices that plaintiffs submitted. *Issues and Decision Memorandum* at 13-15.  Only in the *Final Determination* did Commerce calculate count-size-specific surrogate values, relying on the $5.97 per-kilogram base price, the Urner Barry data, and the respondents' shrimp input purchase quantity information to calculate surrogate values for various count sizes using its six-step

calculation.[9]  *Id.* at 15-16; *Allied Pacific Final Determination Memorandum* at 3-4.  Because of

the apparent deficiencies in the Nekkanti financial statement data and the absence of any attempt

by Commerce to adjust for them, as well as the potential inaccuracies from the methodology that

Commerce adopted, the court concludes that the *Final Determination* lacks an adequate

explanation of how this method of calculating count-size-specific prices for unprocessed shrimp

could have satisfied the Department's obligation to use the best available information.

In summary, the court finds that Commerce failed to subject the SEAI data and the

Nekkanti financial statement data to a fair comparison according to the record evidence and its

own criteria.  The Department's findings underlying the determination to favor the Nekkanti

financial statement data over the SEAI data are inconsistent with the record evidence under most

or all of the Department's own criteria, with the exception of the public availability criterion.

---

[9] Respondents argued in the agency proceeding that Commerce should have used, as the average count size for the Nekkanti financial data, 23.85 shrimp per kilogram, which is within the count-size range of 21 to 25 shrimp per kilogram.  *Ministerial Error Allegations* at 3, Attach. 2.  Commerce, however, found that the calculation of the weighted average count-size range is not a ministerial error.  *Final Ministerial Error Memorandum* at 7.  Commerce referred to the *Issues and Decision Memorandum* at Comment 1, stating that it had explained its methodology for calculating the weighted average count-size range for the PRC and that it would not use the ranged Nekkanti data because Commerce did not know how the data was ranged.  *Id.* at 7-8.  It appears to the court, however, that neither Commerce nor plaintiffs addressed the effect of the headless shrimp on the determination of a count-size midpoint.  *See Ministerial Error Allegations* at 3, Attach. 2; *Final Ministerial Error Memorandum* at 7-8.  The court notes that respondents, in making this argument, appear to have included processed shrimp content in recalculating the total weighted average purchases by Nekkanti.  Because the per-kilogram count of headless shrimp is greater than what the per-kilogram count would have been had the shrimp been head-on shrimp, the inclusion of the partially processed headless shrimp may distort the weighted average midpoint by artificially increasing the count size.

 b.  <u>Commerce Has Failed to Explain Adequately Why the Nekkanti Financial Statement Data</u>
<u>Are Superior to the ACC Data under its Own Criteria and the Record Evidence</u>

 Commerce declined to use the ACC data, stating that the data were not sufficiently insulated from conflict of interest. *Issues and Decision Memorandum* at 13. Commerce did not elaborate on its "conflict of interest" objection. Commerce instead "agree[d] with the Petitioners that [the ACC values] are not reliable sources for valuing the Respondents' raw shrimp input because the source of the data is not sufficiently insulated from conflict of interest." *Id.* In an attempt to explain its rationale, Commerce implied that it preferred to use publicly available surrogate value data because publicly available information, *inter alia*, "represents a reliable source insulated from conflicts of interest." *Id.* This discussion of the merits of public availability, however, does nothing to reveal the Department's reasoning for concluding that the ACC data should be rejected on the ground of conflict of interest. The Department's explanation of why the ACC is not a reliable source does not appear to be based on record evidence. Moreover, Commerce does not squarely address whether the ACC data on shrimp prices are publicly available. Evidence on the record indicates that these data are available to the general public on the ACC website.

 Rather than cite to record evidence and provide reasoning of its own supporting its finding of conflict of interest, Commerce merely adopted by reference the petitioner's conflict of interest objection to the ACC data. Commerce summarized the petitioner's argument as objecting that "the membership and leadership of the ACC is composed of interests adverse to the Petitioners in the instant proceeding. Specifically, the ACC was founded by and shares members, directors, officers, and its U.S. location with the Global Aquacultural Alliance, some

of whose members are subject to the Department's companion investigations [of Indian shrimp producers and exporters]. The Petitioners conclude that the ACC prices are tainted by conflict of interest, and, therefore, should be disregarded." *Id.* at 10. From the Department's characterization of the petitioner's argument and the subsequent statement that Commerce agrees with the petitioner on that point, the court is informed of nothing beyond the Department's conclusory adoption of the petitioner's position that because some of the founders and members of ACC are also members of the Global Aquacultural Alliance, and because some members of the Global Aquacultural Alliance are subject to an antidumping duty investigation, the ACC data is tainted by conflict of interest. *See id.* at 10, 13.

The record evidence indicates that the ACC data are contemporaneous with the period of investigation, which predated the filing of the petition. Given that evidence, it was incumbent on Commerce to cite other evidence from which a reasonable mind could conclude that the ACC's reporting of information on shrimp prices nevertheless must be considered unreliable due to a conflict of interest. In addition, Commerce did not address the fact that Nekkanti is participating in the same companion antidumping investigation or the possibility that the ACC data might incorporate Nekkanti's data because Nekkanti operates in Andhra Pradesh, one of the Indian regions from which ACC collects pricing information. *See Second Surrogate Value Submission* Ex. 3 (stating that the shrimp prices reported by ACC were collected in the states of Andhra Pradesh and Tamil Nadu).

The Department's analysis did not progress to a fair comparison of the ACC data and the Nekkanti financial statement data under Commerce's own criteria. The record evidence does not

support a finding that the ACC data are inferior to the Nekkanti data according to those criteria.

ACC provided count-size-specific "average monthly farm gate price data for raw, whole,

unprocessed black tiger shrimp based on weekly purchase invoices of packers in the states of

Andhra Pradesh and Tamilnadu [*sic*]" for the period January through December 2003. *Id.* The

ACC data, unlike the Nekkanti data, are specific to unprocessed shrimp and are also specific as

to count size. *See id.* The ACC data, unlike the Nekkanti financial statement data, are

contemporaneous with the period of investigation, April 1, 2003 through September 30, 2003.

*See id.* Moreover, the ACC data are more representative of prices in India because ACC consists

of numerous Indian shrimp packers in two Indian regions, Andhra Pradesh and Tamil Nadu,

whereas Nekkanti is but one company. *See id.*

### c.  Commerce Has Failed to Explain Adequately Why the Nekkanti Financial Statement Data Are Superior to the Ranged Devi/Nekkanti Purchasing Data under its Own Criteria

Commerce rejected the publicly available ranged data from Nekkanti and Devi as

inappropriate on the ground that the record did not indicate the method of ranging the data.

*Issues and Decision Memorandum* at 13. Commerce explained that the regulation, 19 C.F.R.

§ 351.304(c), allows a respondent to summarize its data by grouping the data within ten percent

of the actual figure. According to Commerce, the exact methodology of ranging the data

remains at the respondents' discretion. Because Commerce did not know how Nekkanti and

Devi ranged their data, Commerce objected that it could not precisely discern the original values.

Commerce therefore concluded that relying on the ranged data would result in an inaccurate

surrogate value. *Id.* at 13-14; *see also Def.'s Mem.* at 21-22, 30, 32.

The Department's reasoning for rejecting the ranged Devi/Nekkanti data is flawed. The Department's explanation points to no record facts from which a reasonable mind could conclude that the Devi/Nekkanti data are less accurate than the Nekkanti financial statement data for purposes of use as a surrogate value. Commerce recognized that "the value of the shrimp input is the most important factor of production" and reasoned that because the shrimp input is so important, any deviation in the ranged value from the actual value would produce a less accurate surrogate value. *Issues and Decision Memorandum* at 14. However, the fact that Commerce did not know the precise original values represented by the ranged data does not support a conclusion that the surrogate values derived from inherently flawed Nekkanti financial statement data are superior to the surrogate values based on the ranged Devi/Nekkanti data.

## IV. CONCLUSION

The surrogate value for a labor wage rate in the *Final Determination* is the subject of a request by defendant for a voluntary remand, which the court grants in its Order. Concerning the surrogate value for unprocessed shrimp, defendant does not refute the shortcomings of the Nekkanti financial statement data, yet it insists that the Department's discretion to choose among the data sets was so broad that the court must uphold the Department's choice. This the court cannot do. The surrogate value for unprocessed shrimp calculated by Commerce in the *Final Determination* was based on data that were not confined to unprocessed shrimp. The record lacks substantial evidence to support a conclusion that these data were the best available information, even when evaluated according to the Department's own criteria. The surrogate

value for unprocessed shrimp chosen by Commerce, therefore, was supported neither by

substantial evidence on the record nor by adequate reasoning.

### ORDER

For the reasons stated in this Opinion and Order, plaintiffs' motion for judgment on the

agency record is granted, and it is hereby

**ORDERED** that the Department's determinations as set forth in the *Final Determination* and the *Amended Final Determination and Order* are hereby remanded to Commerce for further proceedings consistent with the requirements of this Opinion and Order; it is further

**ORDERED** that defendant's request for a voluntary remand on the issue of the surrogate value for a labor wage rate is hereby GRANTED, subject to the requirements of this Opinion and Order; it is further

**ORDERED** that the Department's determination of the surrogate value for raw, head-on, shell-on shrimp, because it is unsupported by substantial evidence and inadequately explained, hereby is remanded for further administrative proceedings consistent with this Opinion and Order; it is further

**ORDERED** that Commerce may reopen the administrative record if it deems it necessary to do so to allow the submission of additional information required for the calculation, pursuant to 19 U.S.C. § 1677b(c), of a surrogate value for the labor wage rate and for the calculation of a surrogate value for raw, head-on, shell-on shrimp; it is further

**ORDERED** that Commerce shall file a remand determination in which Commerce, in accordance with the requirements of this Opinion and Order, shall redetermine the surrogate value for a labor wage rate and the surrogate value for raw, head-on, shell-on shrimp and, as required by law, shall support its findings of fact concerning the redetermined surrogate value for a labor wage rate and the redetermined surrogate value for raw, head-on, shell-on shrimp by citing to specific evidence on the record, and in which Commerce shall explain its reasons for the choices it makes from among the various alternatives it considers; and it is further

**ORDERED** that Commerce shall have ninety (90) days from the date of this Order to complete and file its remand determination; plaintiffs shall have thirty (30) days from that filing to file comments; and Commerce shall have twenty (20) days after plaintiffs' comments are filed to file any reply.

/s/ Timothy C. Stanceu
Timothy C. Stanceu
Judge

Dated: June 12, 2006
New York, New York